## In re ELLIS et al.
## Patent Appeal No. 3868.

Court of Customs and Patent Appeals.
Dec. 23, 1937.

John L. Woodward and H. F. Woodward, both of Washington, D. C., for appellants.

R. F. Whitehead, of Washington, D. C. (Howard S. Miller, of Washington, D. C., of counsel), for Commissioner of Patents.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

HATFIELD, Associate Judge.

This is an appeal from the decision of the Board of Appeals of the United States Patent Office affirming the decision of the Primary Examiner rejecting claims 1, 3, 4, 9 to 12, inclusive, 21 to 24, inclusive, 28, 30, 33, 35, 37, 39, 40, 42, 44 to 48, inclusive, 53, and 54, in appellants' application for a patent for an alleged invention relating to the "synthetic production of hard, stiff, board-like bodies * * * of high tensile strength, which are highly non-water absorbent, and which have a small co-efficient of expansion in the presence of moisture."

The references are: Smith et al., 1,809,-316, June 9, 1931; Darrah, 1,856,946, May 3, 1932.

Claims 1, 4, 9, 53, and 54 are illustrative of the process claims. They read:

"1. A process for the purpose described, consisting in emulsifying a *raw vegetable drying oil,* mixing the emulsion with

pulped raw wood stock, precipitating the emulsion, manipulating the mass to form a thick porous sheet, drying the sheet to remove substantially *ninety-five per cent of water,* and then simultaneously pressing and heating the sheet, in a manner to harden the oil to produce a stiff, hard sheet, in from fifteen to forty minutes."

"4. A process for the purpose described consisting in mixing an emulsion of a vegetable drying oil with pulped wood stock, manipulating the mass thus prepared to form a sheet, drying the sheet and then simultaneously *pressing and heating the sheet at pressures within the range of from three hundred to six hundred pounds per square inch, at temperatures ranging from three hundred to five hundred degrees Fahrenheit,* for periods ranging from twenty minutes to one hour."

"9. A process for the purpose described consisting of emulsifying a mixture of *raw vegetable oil and size, using an amount of oil substantially within the range of five to twenty per cent of the weight of the finished product, emulsifying the oil by using a weight of water substantially equal to the weight of oil,* and adding to the water a *weight of size substantially within the range of two to five per cent of the weight of the oil,* mixing the water-size with the oil, mixing the emulsion with the pulped wood stock, manipulating the mass to form a sheet, drying the sheet and then simultaneously pressing and heating the sheet, in a manner to harden the oil to produce a stiff, hard sheet."

"53. The process of making a hard vegetable fiber product having great water resisting properties which comprises mixing raw vegetable fibers with *that amount of raw drying oil which will polymerize substantially* simultaneously throughout the whole fiber mass when heat is applied, drying the product to remove substantially all the moisture, and simultaneously heating and pressing the product.

"54. The process for making a hard board of very high tensile strength and having good water resisting properties which comprises mixing a siccative oil with water-containing pulped vegetable matter, making a sheet, *removing moisture from the sheet so that it does not contain a total moisture substantially more than thirty per cent by weight of the finished product,* and then submit*ted* this sheet to combined action of heat and pressure." (Except the word "submit*ted,*" italics ours.)

Claim 21, which is illustrative of the product claims, reads: "21. A hard highly water-resistant board-like body consisting of pulped vegetable material mixed with a vegetable oil, the oil constituting only five to ten per cent of the weight of the body."

Appellants' composition board is made by emulsifying a raw vegetable siccative or drying oil, water, and a size (such as rosin), mixing the emulsion with wood pulp, manipulating the mass so formed into a thick porous sheet, drying the sheet to remove substantially 70 per centum of the water, as stated in substance in claim 54, or substantially 95 per centum of the water, as stated in claim 1, then subjecting the sheet to pressure within the range of from 300 to 600 pounds per square inch, and simultaneously heating it from 20 minutes to one hour at temperatures ranging from 300° to 500° F., as stated in claim 4.

In claim 9 it is stated that the emulsion is prepared by emulsifying an *amount of oil,* "substantially within the range of five to twenty per cent of the weight of the finished product," with water, substantially equal to the weight of the oil, and size "within the range of two to five per cent of the weight of the oil."

Claim 53 calls for an *amount of oil* "which will polymerize substantially simultaneously throughout the whole fiber mass when heat is applied."

Appellants state in their specification that the oils used in preparing their emulsions are "tung oil [Chinawood oil], perilla oil, soybean oil, corn oil or linseed oil"; that the use of rosin in "greater amount than oil" lessens the tensile strength, of the finished product; that it has been discovered that good proportions are "six of oil—four of rosin; seven of oil—three of rosin"; and that good products are obtained by the use of Chinawood oil or soybean oil in quantities ranging from 5 to 30 per centum by weight and rosin size in quantities ranging from 1 to 5 per centum of the weight of the oil.

The patent to Smith et al. relates to synthetic boards or other articles, and a process for making the same. The reference discloses the use of wood pulp, such as pine, spruce, etc., containing a rosin. The chips of wood from which the pulp is produced are first subjected to a steam distillation process for the extraction of turpentine, then treated with naphtha or

gasoline to dissolve the rosin (about 5 to 6 per centum of rosin remaining in the chips), and then ground or shredded, "preferably with water, to form a pulp," to which pulp is added a suitable quantity of a siccative or drying oil, such as linseed oil or "china wood oil," or "semi-drying oils, such as soy bean oil, fish oil, etc." (It is stated in the patent that other wood pulp might be used and rosin added to the oils.) The oil is beaten into the pulp, the excess water is removed, and the mixture is manipulated into the form of a board or other desired shape and dried at temperatures ranging from 180° to 400° F. The patentees state that, "During the drying, the rosin and drying oil interact to form a water resistant film over the surface of the fibers. If a consolidating pressure is applied during the drying, a dense board not pervious to water may be produced. It is preferred to compress the board during the drying operation to form a board of this character. However, by regulating the pressure and the amount of varnish forming materials, a board may be formed which is somewhat porous, although the individual fibers thereof are coated with the varnish and thus rendered resistant to the absorption of the water by the cellulose and the consequent swelling thereof"; that their varnish might be prepared by boiling the oil and rosin, and then applying a solvent for the purpose of thinning the varnish; that they prefer, however, "to deposit the varnish-making materials upon the fibers and to thicken or give the body to the varnish during the drying and heating of the article"; that, when the "unpolymerized [unthickened] varnish constituents are added," less solvent is required and the varnish will be better distributed over the fibers; that the *physical characteristics* of the board might be varied by varying the amount of varnish used and the degree of pressure applied; and that a board of open fibrous construction, resembling an insulating board, might be produced by the use of resinous chips containing 5 to 6 per centum of rosin and a relatively small amount of oil, but that, ordinarily, the "amount of varnish and pressure used in making the board will be sufficient to form a solid and rather nonporous board" suitable for exterior work.

Although the patentees do not definitely and clearly disclose the steps of first drying the board and then subjecting it to heat and pressure, they do disclose the step of subjecting it to pressure during the drying operation. They do not state definitely the amount of oil or the proportions of oil and rosin to be used in making a hard board. However, they clearly disclose the use of wood pulp, rosin, and the same oils as are used by appellants in a raw, as well as in a heated, condition in the making of their product.

The patent to Darrah relates to synthetic boards, and a process for making them. The patentee discloses the use of wood pulp, of the same type as that used by appellants, and an emulsion composed of tung oil (Chinawood oil) and rosin, and also a soluble pitch made from materials other than drying oils. He refers to heating the oil and rosin, and calls the resultant emulsion a condensation product. He does not expressly disclose the use of a *raw* vegetable oil, as do appellants. His emulsion is mixed with the wood pulp. The mixture is manipulated into the form of sheets or boards and, in making an *insulating board,* the wet sheets are dried to the extent of removing over 95 per centum of the water. He states, however, that, if it is desired to make a *hard board,* he removes in the neighborhood of 60 per centum of the water, and then subjects the partially dried board to heat, approximately 300° F., and pressures ranging from 500 to 1000 pounds per square inch; that "The combined effect of pressure and temperature is to produce a hard dense sheet the exact thickness being determined by the amount and kind of raw material used and the amount of pressure and temperatures to which it is subjected"; that, in making a hard board, the pressures may range from 400 to 1,000 pounds per square inch; that the time required "in the press" varies according to the amount of water in the sheet or board, and the desired characteristics of the finished product; that the resultant product depends upon the type of drying oils used; and that *the preparation of such oils* is well known in the art and forms no part of his specification.

Although the patentee does not disclose the precise amount of rosin or oil to be used in his emulsion, he does show the use of rosins, oils (such as linseed oil and Chinawood or tung oil), and wood pulp in making a hard board, and the steps of mixing the emulsion with the pulp, manipulating the mass into the form of boards, drying the boards to remove substantially 60 per centum of the water, and then simultaneously heating and pressing them.

The temperature and pressures used by the patentee (the temperature approximately 300° F., and the pressures ranging from 400 to 1,000 pounds per square inch) are within the range of temperatures (300° to 500° F.) and pressures (300 to 600 pounds per square inch) specified by appellants, e. g., in claim 4. The patentee states that the time required to dry and press the wet sheet or board into a hard board is from 15 to 20 minutes, which is within the range of time specified in the appealed claims.

Counsel for appellants states the issue in the case in the following language: "There is a tangible difference between the invention in question and the citations urged against it, and the point to be decided is whether or not the creation of this difference involves the exercise of invention." He argues that the references do not specify, as do appellants, the use of a *small amount of raw oil,* the preliminary heating of the wet board to remove substantially 95 per centum of the water, and the simultaneous application of heat and pressure to the substantially dry board; and that they do not disclose either appellants' process or the product produced thereby.

It is true that, in making a hard board, neither of the patentees first removes substantially 95 per centum of the water from the wet board, and then subjects the partially dried board to heat and pressure, as do appellants. However, in appealed claim 54 it is stated, in substance, that the preliminary drying of the wet board removes substantially 70 per centum of the water; whereas, in the preliminary drying operation, the patentee Darrah removes in the neighborhood of 60 per centum of the water.

There is nothing in appellants' application to indicate that the removal of substantially 70 per centum of the moisture content of the wet boards in the preliminary drying operation is critical, or that the removal of only 60 per centum of the moisture content, as in Darrah's preliminary drying operation, would in any way affect the final product or have any effect other than that of slightly extending the period of time necessary to perform the last step in appellants' process.

It is argued by counsel for appellants that the references do not disclose the use of a small amount of oil, such an amount, it is stated, as will polymerize substantially simultaneously throughout the entire board.

In the patent to Smith et al. it is stated that the drying process causes the mixture of oil and rosin to "interact and polymerize, and form a varnish upon and penetrating the surfaces of the wood fibers" *during the drying operation.* That is precisely what takes place in appellants' process.

It is further argued by counsel for appellants that the references do not disclose any knowledge of the advantages obtained by regulating the proportions of sizing and vegetable oils.

As hereinbefore noted, the precise proportions of rosin and oil are not stated in either of the references. However, the patentee Darrah stated, with reference to the use of linseed oil, tung oil, and mixtures of tung oil and rosin, that the preparation of such oils and their blending was well understood in the art.

Although appellants stated in their application that, if rosin is used in quantities greater than oil, the *tensile strength* of the finished product is *decreased,* there is nothing therein to indicate that such result was unexpected, or that the proportions of rosin and oil used by them produce a result which differs in kind, rather than in degree, from that produced by the prior art. See In re Swingle et al., 92 F.2d 709, 25 C.C.P.A., Patents, and cases therein cited.

▮ It may be that appellants' process produces a better product at less expense than that produced by the prior art. However, we are unable to hold, after a careful consideration of the record and the arguments of counsel for appellants, that appellants' process and the product produced thereby, as defined in the claims hereinbefore considered, involve invention.

This appeal also brings before us process claims 31 and 32, each of which is narrower than any of the other appealed claims hereinbefore considered. Those claims were finally rejected by the Primary Examiner in his decision of October 7, 1935. Thereafter, on December 30, 1935, appellants appealed to the Board of Appeals, and, on the same day, filed an affidavit by George H. Ellis, one of the appellants. On January 31, 1936, in accordance with the provisions of Rule 135 of the Rules of Practice in the United States Patent Office, the Primary Examiner filed his answer to the appeal, which he concluded with the following statement: "Of the method claims on appeal, those num-

216

bered 31 and 32 have been reconsidered, in view of applicant's affidavit of record. These claims may be deemed to be directed to allowable subject matter and their allowance is respectfully recommended."

In its decision, the Board of Appeals made no special reference to claims 31 and 32, but stated that it found no error in the position taken by the Primary Examiner, and affirmed his "action."

It is stated in the brief of the Solicitor for the Patent Office that the quoted language in the concluding paragraph of the Primary Examiner's statement in answer to the appeal amounts to a withdrawal of the grounds of rejection as to claims 31 and 32; that, as a matter of fact, the Examiner allowed those claims, subject to the approval of the Board; and that, in as much as the Board made no special reference in its decision to such claims but affirmed the "action" of the Examiner, it was the intention of the Board to allow them. In support of his position, the Solicitor cites the case of In re Wagenhorst, 64 P.2d 780, 20 C.C.P.A., Patents, 991, and Rule 139 of the Rules of Practice in the United States Patent Office.

■ It may be, as argued by the solicitor, that it was the Board's intention, although it did not expressly so state, to accept the recommendation of the Examiner and allow claims 31 and 32. However, it does not clearly appear from the decision of the board that such was its intention. Under the circumstances hereinbefore related, it would seem that the Board should have expressly accepted or rejected the Examiner's recommendation as to claims 31 and 32. However, probably through inadvertence, it failed to do so. We think it is necessary, therefore, for a proper disposition of the case, to formally reverse the decision of the Board as to claims 31 and 32, and remand the cause for the purpose of affording that tribunal the opportunity to take such action with regard to those claims as it may deem proper.

Accordingly, the decision of the Board is modified, being reversed as to claims 31 and 32, and in all other respects affirmed, and the cause is remanded for proceedings in accordance with the views herein expressed.

Modified and remanded.